HOUGHTELING *v.* STOCKBRIDGE.

1. WILLS—ANNUITY—ALLOWANCE TO WIDOW—PRESUMPTION.
   Where testator bequeathed an annuity to his wife, and she obtained an allowance by the probate court for family expenses, under 3 Comp. Laws, § 9291, providing that, if the provision made by the will is not sufficient to pay the debts and family expenses, such part of the estate as has not been disposed of by will, if any, shall be appropriated for that purpose, and section 9292, making devises and legacies liable to the payment of debts and family expenses, the order of allowance must be presumed to be in addition to, and not in substitution for, the provision for that purpose in the will.

2. SAME—EQUITY—PROBATE COURT ORDER—INTENT OF PARTIES.
   On a bill filed by an executor and trustee for directions in the performance of certain trust duties, the court cannot change the legal effect of an order of allowance by the probate court for family expenses, because of the intent of the parties, unless such intent is clearly proved, if it can do so in any case.

3. SAME—ANNUITIES—DURATION—TRUSTS—VESTED ESTATES.
   A will provided for the payment of certain annuities to different persons, the same to "cease to be due and payable at the division of my estate" thereinafter mentioned. Subsequent paragraphs provided that the executor should hold the estate as trustee "until such time, not exceeding five years from my decease, as my said trustee shall deem it to be to the best interests of all concerned to make a final settlement and division thereof," and should then, "and within said term of five years," make final division of the trust fund. Owing to the situation of the estate and the depressed financial condition of the country, the estate could not be closed within five years, and the probate court extended the time for settlement. *Held,* that it was the intention of the testator that the estate of the beneficiaries of the trust should vest at the expiration of five years, and that the annuities ceased to be payable at the end of that period, although the estate was not settled.

4. SAME—CONDUCT OF EXECUTOR—RIGHT TO COMPLAIN.
   A widow could not complain of the act of an executor in leaving an unpaid arrearage on her annuity and making payments on other annuities, where the property of the estate

was sufficient to pay, with interest on deferred payments, the entire arrearages due to all the annuitants, including her.

5. SAME.

Where an executor, in good faith, applied the funds of the estate *pro rata* in paying annuities, and during six years the widow made no claim that her annuity was entitled to preference, and did not complain until the executor brought suit for the construction of the will, she should be deemed to have acquiesced in the course pursued by the executor, and could not then claim that she was entitled to preferred payment.

6. SAME.

Where testator owed an indebtedness secured by bonds worth more than the amount of the debt, the executor was justified in paying the same, without allowance by the commissioners, in order to obtain the bonds.

7. SAME.

Where a part of the assets of an estate consisted of stock in a corporation which had a plant that was not a promising investment, and the executor induced another corporation to buy the plant, he was guilty of no wrong in personally taking stock in the purchasing corporation to the amount necessary to buy the plant, and selling it at figures realizing him only a reasonable interest on the investment, the transaction being in good faith and promotive of the interests of the estate.

8. SAME.

An executor was guilty of no wrong in purchasing at par a note due the estate, and taking an assignment of collateral securing it, the estate being in pressing need of money, and the value of the collateral being less than the amount due on the note.

9. SAME.

The action of an executor and his associates in purchasing stock in a corporation in which the estate was interested, and in giving a bond in which the corporation was principal and they sureties, conditioned to save the seller harmless from liability under the laws of the corporation's domicile, was not subject to just criticism on the part of the estate.

10. SAME—REMOVAL OF EXECUTOR.

Where an executor agreed with the members of a corporation, formed to take over the assets of an unprofitable partnership in which the estate was interested, that the estate would share its portion of the loss if the venture should not succeed, which

agreement subsequently cost the estate a certain sum, but there was nothing to impeach the executor's good faith, or to indicate that the transaction, considered as an entirety, was not for the best interests of the estate, whether, in making the arrangement, he exceeded his strict legal authority or otherwise, it furnished no ground for his removal.

Cross-appeals from Kalamazoo; Yaple, J., presiding. Submitted February 23, 1904. (Docket No. 99.) Decided May 17, 1904.

Bill by James L. Houghteling, as executor of the last will and testament, and trustee of the estate, of Francis B. Stockbridge, deceased, against Betsey A. Stockbridge, Cornelia S. Sheldon, and others, for the construction of said will, and for directions as to the performance of certain trust duties. From the decree rendered, all parties appeal. Affirmed.

*Dallas Boudeman*, for complainant.

*N. H. Stewart* and *E. M. Irish*, for defendant Betsey A. Stockbridge.

*George P. Hopkins* and *A. M. & C. H. Stearns*, for other defendants.

CARPENTER, J. Complainant is executor of the last will, and trustee of the estate, of Hon. Francis B. Stockbridge, who, at the time of his decease, was one of Michigan's representatives in the United States Senate. The first-named defendant is the widow of the late Senator Stockbridge. Complainant asks the court of chancery, by this suit, to direct him how to perform certain of his trust duties. Defendant Mrs. Stockbridge files an answer and cross-bill, charging that complainant has improperly performed certain of his duties, and seeks to make him personally chargeable therefor, and prays his removal as trustee.

1. The first question demanding our attention relates to

the claim of Mrs. Stockbridge to the sum of $10,000 for the first year after her husband's death, both as an allowance by the probate court and as an annuity under the will. The facts necessary to the determination of that claim are these: Paragraph 2, subdivision *a*, of the will of Senator Stockbridge, reads as follows: "I give and bequeath to Betsey A. Stockbridge, my wife, ten thousand dollars per year." The value of the estate left by Senator Stockbridge was so uncertain that, shortly after his appointment as executor, complainant feared that he could not safely pay said annuity. He feared that the estate might prove to be insolvent, and that voluntary payment on his part would expose him to the hazard of a suit by creditors. He therefore insisted on either an order from the probate court or a bond from Mrs. Stockbridge which should protect him. This bond Mrs. Stockbridge could not give. Under these circumstances, Mrs. Stockbridge petitioned the probate court for an allowance for family expenses. Among other things, the petition stated the provision of the will respecting the annuity; complainant's contention that he could not with safety pay the same without a bond, which petitioner could not give; that petitioner was without means for adequate support; that it would require $10,000 per annum to maintain her, which sum it was evident the testator intended she should have. It was also stated in said petition that the petitioner expressly reserved the right, for a year, "to elect to waive the terms and conditions of said will." The probate court thereupon made an allowance to Mrs. Stockbridge of $10,000 for the first year after the death of her husband. The circuit court decided that Mrs. Stockbridge was entitled to this $10,000 allowance, and also to the $10,000 annuity for said year.

The authority given by statute to the probate court to make this allowance is found in sections 9291 and 9292 of the Compiled Laws of 1897. Those sections read:

"SEC. 9291. If the provision made by the will, or the estate appropriated, shall not be sufficient to pay the debts,

expenses of administration, and family expenses, such part of the estate, real or personal, as shall not have been disposed of by the will, if any, shall be appropriated, according to the provisions of the law, for that purpose.

"SEC. 9292. The estate, real or personal, given by will to any devisees or legatees, shall be held liable to the payment of the debts, expenses of administration, and family expenses, in proportion to the amount of the several devises or legacies, except that specific devises and legacies, and the persons to whom they shall be made, may be exempted."

We think these sections indicate that an order of allowance for family expenses is to be presumed, and is therefore to be construed, to be in addition to, and not in substitution for, a provision for that purpose in the will. It is contended, however, that the order in question is to be construed as such a substitute, because it was so intended by all the parties interested. If a court of equity could change the legal effect of this order because of the intent of the parties, that intent should be clearly proved. In *Tilden* v. *Streeter*, 45 Mich., at page 540 (8 N. W. 506), it was said, in a controversy where complainant insisted that a deed executed by him was a mortgage:

"Unless the testimony, say the Supreme Court of the United States, is entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. *Howland* v. *Blake*, 97 U. S. 624, 626."

We think stronger language than that might be used where an attempt is made to change the legal effect of an order of court. While we have no doubt that complainant intended that the allowance should be a substitute for the annuity, we cannot say that it is proved beyond a reasonable doubt that Mrs. Stockbridge had that intent. The fact that she expressly reserved the right to elect to waive the terms and conditions of said will is inconsistent with such intent. If it were true that, when she made this petition, she feared that the estate would prove insolvent, she knew, of course, that she might not receive the annuity. But that by no means compels us to conclude that she ex-

pected the allowance to be a substitute for the annuity should those fears prove groundless.    Nor do we think that her rights were waived, under the circumstances of this case, by her failure to assert them at an early stage of the proceedings.    It follows that the trial judge correctly disposed of the claim under consideration.

2. The second question involved is this: Do the annuities provided for in the will cease at the expiration of five years from the death of the testator ?    Paragraph 2 of the will reads as follows:

" I give and bequeath the legacies following :

"(*a*) I give and bequeath to Betsey A. Stockbridge, my wife, ten thousand dollars per year; should she not survive me, and should her sister, Caroline A. Peters, survive her and myself, then I give and bequeath to the said Caroline one thousand dollars per year; and should the said Caroline not survive my said wife and myself, and should her son, George A. Mansfield, survive his mother, my said wife, and myself, then I give the said legacy of one thousand dollars per year to him; subject to the general provisions below stated.

" (*b*) I give and bequeath to Cornelia S. Sheldon, my sister, twelve hundred dollars per year; should she not survive me, or, surviving me, not live to the time of the division hereinafter mentioned, then I give said sum, or the unaccrued portion thereof, to her daughter, Cornelia Sheldon; subject to the general provisions below stated.

" (*c*) I give and bequeath to Marcia E. Houghteling, my sister, twelve hundred dollars per year; should she not survive me, or, surviving me, not live to the time of the division hereinafter mentioned, I give said sum, or the unaccrued portion thereof, to her three daughters, and the survivor or survivors of them, in equal parts; subject to the general provisions below stated.

" (*d*) I give and bequeath to my sister Mary G. Drummond $400 per year; should she, surviving me, not live to the time of the division hereinafter mentioned, the said payment to cease at her death; subject to the general provisions below stated.

" (*e*) I give and bequeath to Theodosia Stockbridge, of Utica, New York, my sister, eight hundred dollars per year; should she not survive me, or, surviving me, not live to the time of the said division, I give said sum, or the

unaccrued portion thereof, to Mary Brown, our cousin, if she survive myself and said Theodosia; said payment to cease at the death of said Mary; subject to the general provisions below stated.

"(*f*) I give and bequeath to Marcia B. Jenks, of Boston, Mass., my cousin, four hundred dollars per year; should she not survive me, or, surviving me, not live to the time of the said division, I give said sum, or the unaccrued portion thereof, to her daughters; subject to the general provisions below stated.

"*Provided*, however, that all the legacies and sums aforesaid be paid in quarterly installments, and that they shall all, at all events, cease to be due and payable at the division of my estate mentioned in paragraphs 4 and 5 hereof; and, further, that they shall be payable out of the income of the estate herein called the general trust fund, if thereto sufficient; otherwise, I direct that they be paid out of the proceeds of sales of stocks belonging to said fund, or loans thereupon, as may seem best to my executor and trustee hereinafter named."

We quote as much of paragraphs 4 and 5 as is necessary to understand what is meant by the foregoing reference thereto:

"Paragraph 4. I hereby give, devise, and bequeath all the rest, residue, and remainder of my estate, not above disposed of, real, personal, and mixed, now held or hereafter to be acquired, wheresoever situate, to James L. Houghteling, my nephew, his heirs, assigns, and successors in trust, as my trustee, to hold, use, invest, and manage the same; in trust, however, upon the uses and trusts herein expressed (such rest, residue, and remainder, with its income and additions, to be herein termed my general trust fund or estate), until such time, not exceeding five years from my decease, as my said trustee shall deem it to be the best interest of all concerned to make a final settlement and division thereof; at which time my said trustee shall make division of all my said general trust estate among the beneficiaries and in the manner herein mentioned.   *   *   *

"Paragraph 5. It is my will that my said trustee, at the time aforesaid, and within said term of five years, make such final division of said general trust fund in the manner and proportions, and among the persons, following, viz.:

"That he pay to my wife, Betsey A. Stockbridge, if then living, ten-thirtieths, or one-third, thereof."

It was found that, owing to the situation of the estate and the depressed financial condition, it could not be closed within said period of five years, and accordingly the probate court extended the time for the settlement, and the estate has not yet been settled, though nearly ten years have elapsed since the testator's death. The trial court was of the opinion that the annuities ceased to be payable at the end of said period of five years. The correctness of this decision depends upon the construction of the clauses above read. To be more specific, it depends upon the application of the language of the testator to the situation that has arisen; and this is construction. Cooley, Const. Lim. (7th Ed.) p. 71, note 1.

It is quite obvious that the testator did not provide for the unforeseen contingency of the settlement of the estate being delayed beyond the period of five years. He undoubtedly thought he was giving all the time that might possibly be required when he fixed that limit. It actually transpires, however, that in this he was mistaken. We cannot give effect to his intent that these annuities shall continue until his estate is settled, and that they shall cease to be payable at the end of five years. It is obvious that that purpose which the testator regarded as less important should yield to that which he regarded as more important. The testator's intent that the estate should pass from the hands of the trustee to his residuary legatees within the period of five years is most clearly expressed, and we can, as hereafter stated, see why he might wish to fix that time definitely. On the other hand, his intent that the annuities should continue until the estate should be distributed is not clearly stated. All that can be said is that it is to be inferred from the language, "They shall all, at all events, cease to be due and payable at the division of my estate."

This reasoning naturally leads us to consider the pur-

pose of the testator in naming a limit of time in which the estate should be closed. It is idle to say that this limitation was merely directory. It clearly was directory in the sense that it did not legally obligate the trustee to close the estate at that period. Nor can we suppose that the testator acted upon the erroneous notion that the direction would be legally binding. He unquestionably intended that the executor should regard it, but we cannot suppose that he thought that he would be under a legal obligation to do so. He did, however, have the right to prescribe the time when the annuities should cease to be payable, and when the estate of the residuary legatees should vest. Did he not, in prescribing this limitation, intend to give it such legal effect as he might? We think he did, and that he intended to fix a time when the annuities should cease and the estate of his widow and other residuary legatees vest. Otherwise no effect whatever is given to this limitation. Otherwise the testator has placed it in the power of the executor and the probate court to continue to pay indefinitely annuities which he intended should cease in five years. Otherwise he has given the executor and the probate court power to prevent the vesting of estates which he intended should vest within a stated period. We think that the trial court properly disposed of this branch of the controversy.

3. We now come to the question of the alleged improper acts of the executor. Defendant Mrs. Stockbridge complains of these acts from two points of view, viz., (a) that they increase the personal charges against complainant in his accounting with the estate, and (b) that they prove complainant's unfitness as a trustee, and justify his removal. From both these points of view these charges will be considered.

The first alleged wrongdoing arises from the fact that there is a considerable unpaid arrearage on the annuity belonging to Mrs. Stockbridge, and that is due, in part, to the fact that complainant has paid in part the other annuities mentioned in paragraph 2 of the will. It is the

claim of Mrs. Stockbridge that the other legacies are mere bounty legacies, while the annuity to her is based, in part at least, upon the fact that it was in lieu of dower, to which otherwise she was entitled; that she is to be regarded as a creditor, to which class the other annuitants do not belong, and that her annuity is therefore to be preferred. We do not think we need to pass upon the question of whether or not, as between Mrs. Stockbridge and the other annuitants, her claim is to be preferred. Mrs. Stockbridge has not sustained, and will not sustain, any damage by the course taken by the executor, for it is clear that the property of the estate is sufficient to pay, with interest on deferred payments, the entire arrearages due to all the annuitants, and therefore her annuity will be paid, with interest on deferred payments. Nor is she in a position to complain that the executor acted improperly in paying in the manner he did. There is nothing to warrant the belief that the complainant did not act in good faith, believing it to be his duty to apply the funds of the estate *pro rata* in payment of these annuities. He pursued that course, to the knowledge of Mrs. Stockbridge, for six years. During this time she made no claim that her annuity was entitled to preference, and did not complain of the course adopted by the complainant until this suit was commenced. Under these circumstances, we are bound to say that she acquiesced in the course complained of, and that there is therefore no merit in her present complaint.

The next wrong which it is alleged that complainant perpetrated on the trust estate was this: Complainant, at the death of the testator, owed the estate $65,000. Testator owed an indebtedness of $25,000, which was secured by bonds of the par value of $30,000. Complainant paid this last-mentioned note, secured the bonds which were collateral thereto, and sold them at par. He duly accounted to the estate for the proceeds of said sale and the balance of his own indebtedness. It is claimed that he had no right

to pay this $25,000 note, and deduct the same from the amount owing by him, because it had never been allowed by commissioners on claims. It is doubtful if this question has not been foreclosed by an adjudication on complainant's accounts, not appealed from. Assuming it to be open, there is no merit in it. For the purpose of obtaining the collateral securities, complainant was justified in making the payment in question. *In re Lambie's Estate,* 94 Mich. 489 (54 N. W. 173); *Long* v. *Landman,* 118 Mich. 174 (76 N. W. 374). It is apparent that if he had not done so, and if the indebtedness had never been paid, the estate would have lost the difference between the $25,000 note and the amount realized by the sale of the bonds.

The next wrong to which our attention is directed is this: Among the assets of the estate was stock in the Kalamazoo Spring & Axle Company. The Kalamazoo Spring & Axle Company had a radiator plant, which was not a promising investment. Complainant induced the American Radiator Company, of Chicago, to buy this plant, and pay therefor the sum of $31,199.20. This was a good sale, and the proceeds went to the corporation, and the estate, as a stockholder, received its proportion of them. It is claimed that complainant perpetrated a wrong, because, in order to induce this purchase, he personally took stock in the American Radiator Company to the amount of $31,199.20. This stock he subsequently sold at figures which only realized him a reasonable interest on his investment. We do not think there is anything in this transaction to impeach complainant's personal good faith. It will scarcely be claimed that he should have invested the trust funds of the estate in his hands in a purchase of this stock. We think one of the motives which controlled complainant in entering into this transaction was to promote the interest of the estate, and that he succeeded. It is scarcely necessary to add that it furnishes no ground for complaint.

The next wrong alleged to have been done is this: Among the assets of the estate was a note of $16,250, made by George Stockbridge, a relative of the testator, secured by $40,000 of the Spring & Axle stock. Complainant purchased this note, paying its par value, and obtaining an assignment of the stock. The evidence shows that the estate was in pressing need of money, and that the value of the collateral is less than the amount due on the note. We are unable to see how the estate is wronged by this transaction. It has got every cent to which it was entitled, and has lost nothing.

Complaint is made of complainant's management of the affairs of the Union Lumber Company, a California corporation. When Senator Stockbridge died, he owned stock in the corporation of the par value of $299,100 and bonds for the value of $78,000, and the corporation was indebted to him in a large amount. The estate now owns no bonds, and stock of the value of $186,980 only. When Senator Stockbridge died, complainant had no interest in said corporation. He now owns a large amount of its stock. This statement of the situation, which is substantially that made by the solicitors of Mrs. Stockbridge, demands an explanation, and that explanation is not wanting. The bonds have been sold, and the proceeds accounted for. The estate, and every other stockholder, surrendered three-eighths of their holding in order to create $750,000 of preferred stock, which was sold and applied in payment of the corporate indebtedness. The interest in the corporation acquired by complainant was purchased; not from the estate, but from another stockholder, viz., Gen. R. A. Alger.

Complaint is made because complainant and his associates, in purchasing this stock, gave a bond to Gen. Alger, in which the corporation is principal and they sureties, to save him harmless from liability as a stockholder under the laws of California. The giving of this bond is not subject to just criticism on the part of the estate or any other stockholder. It did not increase the liabilities of the corpo-

ration, for it merely obligated it to pay its own debts; and we think the interests of the estate were benefited, rather than injured, by the fact that complainant became personally interested in the corporation in which the estate held this stock. We are unable to see how his interest as a stockholder is in any way antagonistic to the interest of the estate, another stockholder.

Complaint is made of the disposition of certain assets formerly belonging to S. A. Browne & Co., a partnership composed of Senator Stockbridge and S. A. Browne. This partnership owned a stock farm, and had been engaged in raising and selling fast horses. It was a most unprofitable venture. At the time of Senator Stockbridge's death its liabilities were about $152,000, and all that was realized from its assets, together with what could be obtained from Mr. S. A. Browne, whose death occurred soon after that of Senator Stockbridge, aggregated about $27,000. The residue of these assets was sold for $25,100 to the Kalamazoo Farm Company, a corporation formed, it would seem, to continue the business carried on by S. A. Browne & Co., in which Senator McMillan owned the majority of the stock, and one S. R. Martin owned nearly all the remainder. Said S. R. Martin was a clerk in complainant's office, and we infer from the testimony that he became a stockholder at complainant's request, and that he really held the stock as trustee for the estate. At any rate, it appears that complainant agreed with him and with Senator McMillan that the estate would share the proportion of loss chargeable to said stock if the venture should not succeed. It did not succeed, and the estate paid, in consequence, $6,093.53. This transaction is not complained of in the pleadings in the case, and it is asserted in the brief for complainant, and not denied in that of defendant, that this item has been allowed in the court below, and that no appeal has been taken from the order allowing it. We shall not, therefore, undertake to determine the strict legal authority of the executor to make this arrangement. The only question which we can deter-

mine is whether it furnishes ground for his removal. He disposed of this property for $25,100, which, as we understand, went to pay the partnership debts, and thereby reduced the loss of the estate, and entered into an arrangement which subsequently cost the estate $6,093.53, so that the estate realized from this sale the net sum of $19,000. If it be conceded that the executor exceeded his strict legal authority,—a question which we do not consider before us, and which we do not determine,—there is nothing to impeach his personal good faith. Nor is there anything to indicate that the whole transaction, considered as an entirety, was not for the best interests of the estate. It certainly furnishes no ground for the removal of the trustee.

In addition to the foregoing, it should be stated that all the other persons interested in this estate, viz., the owners of two-thirds of the residue, desire to have complainant continued as the trustee. We quote with approbation the language of the decree in the court below:

"The situation of the estate as it went into the hands of James L. Houghteling, the executor, required financial and executive ability in order to preserve it, more than estates ordinarily require; and, in what he has done to meet the difficulties which confronted him, there appears to be no sufficient reason for his removal from his position of executor and trustee, and his removal, as prayed for by the defendant Betsey A. Stockbridge, would be detrimental to the interests of the estate."

We think we have discussed all the objections to the decree appealed from. That decree will be affirmed. Neither party will recover costs.

MOORE, C. J., GRANT and HOOKER, JJ. concurred. MONTGOMERY, J., took no part in the decision.